UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| **BRANDY M. LAMBRIGHT** ) | |
| **f/k/a Brandy M. Cousins,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **CAUSE NO. 1:12-CV-138** |
| ) | |
| **CAROLYN W. COLVIN,**[1] ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION AND ORDER

Plaintiff Brandy Lambright, formerly known as Brandy M. Cousins, appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[2] (*See* Docket # 1.)  For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Lambright applied for SSI and DIB in October and November 2008, respectively, alleging that she became disabled as of March 5, 2007. (Tr. 11, 34, 136-37.)  The Commissioner denied Lambright's application initially and upon reconsideration, and Lambright requested an administrative hearing. (Tr. 70-98.)  On June 18, 2010, a hearing was conducted by

---

[1] Although Plaintiff brought this suit against Michael J. Astrue, the former Commissioner of Social Security, Carolyn W. Colvin became the Acting Commissioner on February 14, 2013. (Docket # 24 at 1 n.1.)  As such, under Federal Rule of Civil Procedure 25(d), Colvin is automatically substituted as a party in place of Astrue. FED. R. CIV. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (Docket # 13); *see* 28 U.S.C. § 636(c).

Administrative Law Judge ("ALJ") Patrick Nagle, at which Lambright, who was represented by counsel, and a vocational expert ("VE") testified. (Tr. 28-67.) On August 17, 2010, the ALJ rendered an unfavorable decision to Lambright, concluding that she was not disabled because she could perform a significant number of jobs in the economy. (Tr. 11-21.) The Appeals Council denied Lambright's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-7); 20 C.F.R. §§ 404.981, 416.1481.

Lambright filed a complaint with this Court on May 1, 2012, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Lambright contends that the ALJ's opinion is materially flawed because he: (1) improperly discounted the credibility of her symptom testimony; (2) failed to evaluate evidence and assign restrictions relating to her purported need to elevate her legs and avoid work stress, pulmonary irritants, and hazards; and (3) failed to award at least a closed twelve-month "period of disability." (Br. in Supp. of Pl.'s Compl. to Review Decision of Commissioner of Social Security Administration ("Br. in Supp.") 13-23.)

## II. FACTUAL BACKGROUND[3]

*A. Background*

At the time of the ALJ's decision, Lambright was twenty-nine years old; had a high school education and one year of college classes; and possessed work experience as an assembler, cashier, and child supervisor. (Tr. 60-62, 136, 218, 280.) She alleged on her disability application that she became disabled due to congestive heart failure. (Tr. 210.)

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 1,297-page administrative record necessary to the decision.

At the hearing, Lambright testified that she had experienced a heart attack on or about March 5, 2007, her alleged onset date. (Tr. 34.)  She eventually returned to work, but then stopped working in 2008 due to a high risk pregnancy. (Tr. 36-39.)  When asked why she did not return to work after she miscarried in May 2009, Lambright responded: "I don't know actually," adding "[i]t's kind of more convenient to stay home with my son . . . to be honest." (Tr. 38-39.)  She testified that she has not looked for a job since she left her last employer, but thought that she could work full time at a job if it allowed her to alternate between sitting and standing. (Tr. 58-59.)

Lambright elaborated that she lives with her boyfriend, who supports her financially, and her five-year-old son. (Tr. 32, 38-39.)  On a typical day, she gets her son ready for school and then takes a nap; after that she performs cooking and other household tasks, resting intermittently and sitting as often as she can. (Tr. 39-40, 49, 53.)  She stated that she drives a car and goes shopping once a week. (Tr. 46-47.)  She was taking three college courses, attending a four-hour class on campus three nights a week for the past six months, and planned to enroll in the upcoming summer session. (Tr. 57-58.)  In her spare time, she takes her son to the park, goes swimming, and attends family functions. (Tr. 45-46.)  Lambright stated that in the last eighteen months she has had at least one "bad day" a week where a relative watches her son and she lies down all day. (Tr. 55-56.)

As to her symptoms, Lambright explained that she has no energy and easily gets winded and that her various medications increase her fatigue. (Tr. 40, 42, 52.)  She complained of some swelling in her legs at times, and thus she takes a water pill and tries to elevate her legs when sitting down. (Tr. 48-50.)  She often has to stop and rest when climbing one flight of stairs. (Tr.

52.) She sometimes gets short of breath and, since late 2009, has chest pains when walking; she gets dizzy if she gets up too fast. (Tr. 40-42, 52, 54.) In the month preceding the hearing, she was having trouble sleeping and also stated that she is supposed to wear hearing aids. (Tr. 43, 53.) She also complained of depression, anxiety, and irritability, for which she takes medication. (Tr. 44.)

### B. *Summary of the Medical Evidence*

On July 22, 2003, Lambright experienced abnormal intrauterine bleeding secondary to oral contraceptives. (Tr. 635.) In October 2004, while pregnant with her son, she was hospitalized with a deep venous thrombosis and pulmonary embolism and was treated with Heparin, Lovenox, and Coumadin. (Tr. 307, 383-83, 1004.)

In March 2007, Lambright was hospitalized after experiencing a non-Q wave myocardial infarction. (Tr. 295, 307-08, 363.) She underwent a coronary angiography, left ventriculography, and attempted percutaneous transluminal coronary angioplasty. (Tr. 363-65, 368-70.) She was placed on a beta blocker, Plavix, and aspirin. (Tr. 370.) The following month, a specialist started her back on Coumadin and Lovenox. (Tr. 388.)

In May 2007, Lambright underwent a catheterization procedure to repair the atrial septal defect in her heart. (Tr. 295, 376.) In June 2007, Lambright was hospitalized after an episode of chest pain, premature ventricular contractions, and left hand parathesias while working at Lowe's, and was seen by Dr. George Brodell. (302-03.) She reported that overhead work and stress worsened her chest pain. (302.) Medical testing revealed no evidence of myocardial infarction, and two EKGs were normal. (Tr. 298-99, 302-03.) Dr. Brodell concluded that Lambright's pain was likely musculoskeletal in nature, rather than cardiac, and scheduled her for

further testing. (Tr. 303.)

On July 28, 2007, Lambright went to the emergency room for chest pain after lifting a forty-pound bag of building material at work; she also complained of left calf pain, which worsened with walking or weightbearing. (Tr. 295-97.)  An EKG revealed a normal sinus rhythm with some nonspecific inferior T-wave changes. (Tr. 296.)  On September 4, 2007, Lambright underwent a work up for a possible hypercoagulable state; the results, however, were negative. (Tr. 400-02.)

On October 23, 2007, Lambright's primary care physician listed depression and anxiety among her diagnoses. (Tr. 591, 610.)  Her medications included Lexapro, Lasix, and K-Dur. (Tr. 591.)

On November 16, 2007, Lambright underwent a cardiac catheterization, which revealed an essentially normal coronary angiogram, excellent left ventricular function, and moderately severe pulmonic hypertension with right ventricular failure. (Tr. 464-655, 471-72.)  No disease was found in any of the coronary arteries, and left ventricular function was normal. (Tr. 465.)  One week later she was hospitalized for pleuritic chest pain. (Tr. 536-51.)  A pulmonary function test was consistent with a mild to moderate restrictive process, which, in large part, was likely due to obesity. (Tr. 528.)

Lambright visited her primary care physician approximately six times from December 2007 to September 2008 for various ailments, including flu-like symptoms, fatigue, and medication management. (Tr. 593-606.)  In February 2008, she underwent a medical procedure for abnormal uterine bleeding and thickened endometrium. (Tr. 514.)  In April 2008, she had a right ankle avulsion fracture secondary to a fall. (Tr. 730-33.)  On December 1, 2008, a

pregnancy test was positive. (Tr. 632-34.)

On February 26, 2009, Lambright underwent a psychological evaluation at the request of the state agency. (Tr. 786-91.) The psychologist noted that she had no problems in social functioning and that she was "quite candid about how little her condition holds her back." (Tr. 788.) She appeared logical, coherent, clear, organized, and quite verbal; her affect was relaxed and cheerful. (Tr. 789.) Lambright told the examiner that she intended to start counseling to help deal with her problems. (Tr. 786.) The psychologist wrote that aside from heavy labor and handling sharp objects because of taking blood thinners, "there do not seem to be any limitations on her ability to work." (Tr. 790.) He assigned her a Global Assessment of Functioning ("GAF") score of 73, noting her financial problems, housing, congestive heart failure, and pregnancy;[4] he did not, however, assign her a psychological-related diagnosis. (Tr. 790.)

One week later, Lambright was evaluated by a mental health therapist, stating that she wanted to start counseling to help her get through a stressful time. (Tr. 882-85.) She was pregnant and ostracized by her parents; her physician had taken her off Lexapro due to the pregnancy. (Tr. 882.) She was diagnosed with major depressive disorder and generalized anxiety disorder and assigned a GAF of 55; a psychiatrist countersigned the evaluation. (Tr. 882, 885.)

Also in March 2009, Donna Unversaw, Ph.D., a state agency psychologist, reviewed

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). Relevant to this appeal, a GAF score of 71 to 80 reflects that if symptoms are present, they are transient and expectable reactions to psychosocial stressors, causing no more than a slight impairment in social, occupation, or school functioning. *Id*. And a GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

Lambright's record and concluded that she did not have a severe mental impairment. (Tr. 792-804.)  Dr. Unversaw noted that Lambright did not allege a mental condition as a basis of her disability application; had not received mental health treatment, other than a prescription for Lexapro from her primary care physician; and had no limitations socially or with activities of daily living. (Tr. 804.)  Dr. Unversaw's opinion was later affirmed by a second state agency psychologist. (Tr. 875.)

Lambright underwent a disability examination by Dr. Michael Holton on March 14, 2009. (Tr. 807-10.)  Her heart had a regular rate and rhythm without murmurs, rubs, or gallops; there was no palpable chest wall tenderness or evidence of cardiac enlargement. (Tr. 808.)  She exhibited normal gait and station, had no difficulty walking on heels and toes, and her muscle strength and tone were normal. (Tr. 808-09.)  Some range of motion deficits were identified in the spine, hips, and ankles. (Tr. 810.)  Dr. Holton assigned diagnoses of coronary artery disease, status post myocardial infarction, currently stable; history of congestive heart failure; history of pulmonary embolus; and current pregnancy. (Tr. 809.)

On April 4, 2009, Dr. M. Brill, a state agency physician, reviewed Lambright's record, noting her history of congestive heart failure and pulmonary embolism. (Tr. 811.)  He observed, however, that her most recent echocardiogram and "ABG" were normal. (Tr. 811.)  He concluded that her physical impairments were not severe. (Tr. 811.)  Dr. Brill's opinion was later affirmed by a second state agency physician. (Tr. 874.)

On May 7, 2009, Lambright underwent a repeat low transverse caesarean section and bilateral tubal ligation with twenty-eight week fetal demise. (Tr. 1034-35.)

Later in May 2009, a chest x-ray indicated a left lower lung lobe infiltrate, and a lung

scan revealed a moderate to high probability for a pulmonary embolism. (Tr. 831, 833, 861.) She also had shoulder pain and a rib fracture. (Tr. 987-98.)  Testing revealed positive findings for the Lupus anticoagulant; systemic anticoagulation therapy resumed the next day. (Tr. 812-13, 891, 912.)  In July, Lambright's primary care physician noted edema and prescribed Maxide. (Tr. 923.)

In September 2009, an ear, nose, and throat specialist diagnosed Lambright with bilateral sensorineural hearing loss and recommended a hearing aid trial. (Tr. 919.)  It was noted that she experienced occasional dizziness related to her hypertension. (Tr. 919.)

Lambright was seen by her treating cardiologist ten times from September 2009 to April 2010 for evaluation and monitoring of her anticoagulation status and treatment. (Tr. 945-55.)  An October 2009 stress test showed moderate perfusion abnormality of mild intensity in the anterior wall and a moderate perfusion abnormality of moderate to severe intensity involving the basal lateral wall. (Tr. 939.)  Images showed normal left ventricular size with normal wall motion and systolic thickening of all segments. (Tr. 939.)  The left ventricular ejection fraction was normal, and the right ventricle was normal in size. (Tr. 939.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744

(7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. §

404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On August 17, 2010, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 11-21.) At step one he noted that Lambright had worked at the level of substantial gainful activity for approximately eighteen months after her alleged onset date and had stopped working for reasons unrelated to her alleged impairments. (Tr. 13.) He chose, however, to set this threshold disqualifier aside and proceed to step two. (Tr. 13.) There, he determined that she had the following severe impairments: coronary artery disease, antiphospholipid antibody syndrome, sleep disorder, depression, and obesity. (Tr. 13.) At step three, the ALJ determined that Lambright's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 14.)

Before proceeding to step four, the ALJ determined that Lambright's symptom testimony

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

was not reliable to the extent it was inconsistent with the following RFC:

> [T]he claimant has the residual functional capacity to perform light work . . ., except that she must avoid concentrated exposure to extreme heat, and she only can perform work limited to simple, routine and repetitive tasks.

(Tr. 16.) Based on this RFC and the VE's testimony, the ALJ concluded at step four that Lambright could perform her past relevant work as a small parts assembler, as actually and generally performed. (Tr. 19.) Additionally, the ALJ found at step five that she could perform a significant number of light work jobs within the economy, including counter clerk, laundry sorter, and deli slicer. (Tr. 19-20.) Alternatively, the ALJ stated that Lambright could perform a significant number of sedentary jobs in the economy, including document preparer, unskilled information clerk, and unskilled order clerk. (Tr. 20.) Accordingly, Lambright's claims for DIB and SSI were denied. (Tr. 21.)

### C. The ALJ's Credibility Determination Will Not Be Disturbed

Lambright first challenges the ALJ's credibility determination, contending that the ALJ erred by merely offering "boilerplate" language without any explanation as to why her assertions of disabling symptoms were not credible. The ALJ's credibility determination, however, easily withstands scrutiny.

When making his credibility determination, the ALJ did indeed recite the template language similar to that criticized by the Seventh Circuit Court of Appeals in *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012), and *Martinez v. Astrue*, 630 F.3d 693, 696-97 (7th Cir. 2011). That is, the ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to

the extent they are inconsistent with the [assigned] residual functional capacity assessment." (Tr. 16.) Lambright argues that in using this language, the ALJ "provide[d] no explanation as to how credible or non-credible [her] specific statements [were]." (Br. in Supp. 17.)

But as the Seventh Circuit explained in *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012), "[i]f the ALJ has otherwise explained his [credibility] conclusion adequately, the inclusion of [the template] language can be harmless." Here, Lambright ignores the ALJ's other, more specific findings about her credibility that adequately explain his conclusion.

In that regard, in the paragraph immediately preceding the template language, the ALJ stated:

> At the hearing, the claimant testified that she is disabled due to her severe medical impairments. The claimant testified that she is fatigued most of the day due to her medications and easily becomes short of breath when climbing stairs or walk[ing] long distances. However, the claimant also testified she would work if she had to, but it was much more convenient for her to stay home and take care of her son. Additionally, the claimant has admitted certain abilities that provide support for part of the residual functional capacity conclusion in this decision. For instance, the claimant testified that she currently attends college and is able to take care of her special needs child.

(Tr. 16.) Thus, in discounting Lambright's credibility, the ALJ observed that her statements were inconsistent in that she filed a disability application alleging that she could not work due to her physical limitations, but then testified that she *could* work in certain settings but simply found it more convenient to stay home and care for her son. (Tr. 39, 59.) Similarly, the ALJ noted that Lambright told a psychological examiner in 2009 that she "preferred a job to disability because she wants to get out of the house more." (Tr. 18 (citing Tr. 879).) Of course, "[o]ne strong indication of the credibility of an individual's statements is their consistency," which the ALJ found to be somewhat lacking in this instance. SSR 96-7, 1996 WL 374186, at *5; *see*

*Kornfield v. Apfel*, No. 00C 5642, 2003 WL 103009, at *4 (N.D. Ill. Jan. 9, 2003) (discounting a claimant's credibility due to her inconsistent statements).

As recited above, the ALJ thought that Lambright's activities of daily living—specifically, her ability to attend college classes four hours a night, three nights a week, and care for a special needs son—also undercut her claim of disability. An ALJ is entitled to consider a claimant's performance of daily activities as a factor in his credibility assessment. *See Schmidt*, 395 F.3d at 746-67; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p, 1996 WL 374186, at *3. In that same vein, later in the decision the ALJ noted that Lambright had worked for eighteen months after filing her disability application and that she had stopped working due to a high risk pregnancy, *not* her cardiac condition. (Tr. 17); *see Simila v. Astrue*, 573 F.3d 503, 529 (7th Cir. 2009) (considering claimant's work history when discounting his credibility); *see generally Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (unpublished) ("There is no requirement [for] tidy packaging . . . ; we read the ALJ's decision as a whole and with common sense.").

In addition, the ALJ found it significant that there were no restrictions placed upon Lambright by her treating physicians and that the state agency physicians and psychologists found her conditions were not severe. (Tr. 17-19.) "[A]n ALJ may consider the lack of medical evidence as probative of the claimant's credibility." *Smith v. Apfel*, 231 F.3d 433, 439 (7th Cir. 2000); *see Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."). Indeed, "[i]t is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir.

13

2004) (citing 20 C.F.R. § 404.1512(c)).

Similarly, the ALJ observed that, with respect to Lambright's blood clotting problems, her medications "have been relatively effective in controlling the claimant's symptoms." (Tr. 17.) So much so that her hematologist discharged her to the care of her primary care physician. (Tr. 17); *see Simila*, 573 F.3d at 519 (7th Cir. 2009) (explaining that the Social Security "regulations expressly permit the ALJ to consider a claimant's treatment history"); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (finding that claimant's subjective complaints of disabling pain were not entirely credible where the claimant's treatment was "routine and conservative"); 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p, 1996 WL 374186, at *7.

In sum, regardless of the inclusion of "boilerplate" language, the ALJ adequately considered the credibility of Lambright's symptom testimony in accordance with the factors identified in 20 C.F.R. §§ 404.1529(c) and 416.929(c) and ultimately determined that her symptoms were not of disabling severity. In doing so, the ALJ sufficiently built an accurate and logical bridge between the evidence and his conclusion, and his determination is not "patently wrong." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Therefore, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, will not be disturbed.

### D. *The RFC Assigned by the ALJ Is Supported by Substantial Evidence*

Next, Lambright claims that the ALJ failed to accommodate all of her various ailments when assigning her RFC. Like her first argument, Lambright's second contention fails to warrant a remand of the Commissioner's final decision.

The RFC is a determination of the tasks a claimant can do despite her limitations. *See* 20

C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p, 1996 WL 374183, at *5; *see* 20 C.F.R. §§ 404.1545, 416.945. When assigning an RFC, an ALJ must consider the combined effect of a claimant's severe and non-severe impairments. *See Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005); *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004); *Clifford*, 227 F.3d at 873; *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000); 20 C.F.R. §§ 404.1523, 416.923.

Lambright argues that the ALJ erred by failing to discuss and incorporate into the RFC her purported need to elevate her legs and avoid pulmonary irritants due to allergic rhinitis, hazards due to anticoagulative therapy, and work stress due to anxiety. But the RFC and hypotheticals posed by the ALJ to the VE must incorporate the claimant's impairments only "to the extent that the impairment is supported by the medical evidence." *Jens*, 347 F.3d at 213.

Although Lambright testified that she sits "every chance [she] gets" and "tr[ies] to elevate [her] legs when [she is] sitting down" (Tr. 49), she fails to point to any medical source opinion instructing her to elevate her legs with any regularity. As such, the ALJ was not required to incorporate into the RFC Lambright's uncorroborated assertion concerning her purported need to elevate her legs. Likewise, Lambright fails to produce a medical opinion indicating that she needs to avoid pulmonary irritants due to nonsevere allergic rhinitis. *See Jens*, 347 F.3d at 213.

As to Lambright's claim that she needs to avoid "work stress due to anxiety," the ALJ thoroughly considered the mental health source opinions, her daily activities, and her mental health treatment regime, which essentially consisted of anti-depressant medication prescribed by her primary care physician. (Tr. 15, 18.)  No medical source opinion of record, however, indicated that Lambright had anxiety-related restrictions; in fact, Dr. Davidson, a consulting psychologist, did not even assign Lambright a mental health diagnosis. (Tr. 18 (citing Tr. 790).) As the ALJ observed, Lambright told Dr. Davidson how little her mental condition held her back and that she was most worried about her financial problems and housing situation. (Tr. 18 (citing Tr. 790).)  Again, restrictions for a claimant's impairments need only be incorporated "to the extent that the impairment is supported by the medical evidence." *Jens*, 347 F.3d at 213.

And finally, Lambright claims that the ALJ erred by failing to incorporate a restriction regarding the potential affect of hazards in connection with her anti-coagulation therapy, asserting that a person undergoing this treatment must avoid activities in which she would be exposed to moving or protruding parts or where she would be vulnerable to puncture, laceration, or serious bruises.  But even if the ALJ did err in this regard, it was ultimately harmless. *See generally Shramek*, 226 F.3d at 814 (explaining that harmless errors are those that do not ultimately impact the outcome of the determination).

Even if the deli slicer job was eliminated from the ALJ's list of light work jobs that Lambright could perform, the ALJ concluded in the alternative that Lambright *also* had the capacity to perform the sedentary jobs of unskilled information clerk and unskilled order clerk. (Tr. 20.)  Lambright does not suggest that the proposed restriction would ultimately change the outcome of the ALJ's decision with respect to these alternative jobs.  Consequently, remanding

the case on the basis of this restriction would "sacrifice[] on the altar of perfectionism the claims of other people stuck in the queue." *Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985)*; see Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("[N]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

To reiterate, " the claimant bears the burden of supplying adequate records and evidence to prove [her] claim of disability." *Scheck*, 357 F.3d at 702. The Court is easily able to track the ALJ's reasoning concerning his assignment of Lambright's RFC, and thus he has done enough. *See Rice v. Barnhart*, 384 F.3d 363, (7th Cir. 2004) (finding that the ALJ satisfied his "minimal duty to articulate his reasons and make a bridge between the evidence and the outcome as to his step five determination"). Consequently, Lambright's challenge to the ALJ's step-four finding does not merit a remand.

### E. Lambright's Assertion That She Was Entitled to at Least a Closed Period of Disability Is Unpersuasive

Finally, Lambright contends that the ALJ erred by failing to award at least a closed "period of disability" and by failing to explain why there was no twelve-month period in which she was unable to sustain full-time work. Lambright's argument, however, is unavailing.

To be considered disabled under the Act, a claimant bears the burden of establishing that she has been unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(3)(A). It is the inability to engage in any

substantial gainful activity, and not merely the impairment itself, that must last or be expected to last for a period of not less than twelve months. *Barnhart v. Walton*, 535 U.S. 212, 216-22 (2002).

Lambright specifically points to the period of March 2007, when she had her heart attack, to May 2009, when she was in the emergency room with a pulmonary embolism. She argues that during this period she was "in the emergency room, in surgery, or hospitalized about 8 times," each of which "represented a life threatening event." (Br. in Supp. 23.)

But Lambright rather incredibly ignores the fact that, as the ALJ noted, she worked at the level of substantial gainful activity for approximately eighteen months *after* her alleged onset date—that is, until September 2008. In fact, all but one of the hospitalizations, emergency room visits, or surgeries that Lambright refers to occurred while she was still working. (*See* Tr. 295-96, 298-99, 471-72, 514, 536.) Furthermore, Lambright stated that she ultimately stopped working due to a high risk pregnancy, *not* because of health issues related to her disability claim. (Tr. 13, 17, 37-38.) And when asked why she did not return to work, she testified that it was simply more convenient to stay home with her son. (Tr. 16, 39.)

Moreover, the ALJ correctly observed that Lambright underwent a closure of the atrial septal defect without complications in May 2007. (Tr. 17, 698.) Then in November 2007, she had a cardiac catheterization, which showed no evidence of disease and excellent flow characteristics. (Tr. 17, 686.) An October 2009 echocardiogram showed a normal left ventricular ejection fraction, only mild tricuspid regurgitation, and no obvious intracardiac masses. (Tr. 17, 686.) And, although Lambright was found to have a moderate to high probability for pulmonary embolism in May 2009, the ALJ discerned from the medical records

that thereafter her medications were relatively effective in controlling her symptoms. (Tr. 17.) He also considered that Lambright's hematologist discharged her in May 2009 to the care of her primary care physician for medication management. (Tr. 17.)  As the ALJ emphasized, no treating physician assigned Lambright restrictions related to her cardiac condition or, for that matter, any other condition. (Tr. 17, 19.)

Therefore, Lambright's final argument is defied by the record.  The ALJ correctly found that Lambright was not disabled for any continuous twelve-month period during the time period under consideration, and his reasoning in this respect is easily traced. *See generally Stephens*, 766 F.2d at 287-88 ("If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough.").

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Lambright.

SO ORDERED.

Enter for this 5th day of April, 2013.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge
